WhitakeR, Judge,
delivered the opinion of the court:
On November 23, 1935, plaintiff entered into a contract with the defendant for the construction of Army barracks at Fort McClellan, Alabama. The contract provided for the completion of the work by July 30, 1936, but on account of certain delays it was not in fact completed until April 7,1937. There were extensions of time granted, however, which covered the delay in completion, and no liquidated damages were assessed.
Plaintiff sues, first, for damages resulting from defendant’s alleged failure to furnish sufficient qualified labor and, second, for the extra cost of the use of salt-glazed tile on wall and partition bases.
It is alleged that special condition 3 of the specifications required defendant to furnish sufficient qualified labor for the plaintiff to perform his contract without delay, and that by the failure to do this defendant breached its contract. This condition reads:
Employment of union labor. — The following, which is hereby made a part of these specifications, is quoted from Administrative Order #15 of the Works Progress Administration, dated August 15, 1935.
“All organized labor, skilled and unskilled, when organized labor is desired and requested by the contractor, which is employed upon projects prosecuted under contract shall be supplied by the employment agencies designated by the United States Employment Service, from the membership of recognized unions, with preference, first, to those members of such unions who constitute regular employees of the contractor and who are on the local public relief rolls, second, to other members of such unions who *385 are on tbe relief rolls, and upon the exhaustion of union members on such rolls, to any other members of the union. In the event, however, that qualified workers are not made available from the membership of the unions within forty-eight hours (Sundays and holidays excepted) after a request therefor is filed by the contractor, and the employment agency has notified the unions of the receipt of such request, such labor may be chosen by the contractor from other qualified workers, supplied by employment agencies designated by the United States Employment service.”
Whether or not this provision obligated the defendant to furnish a sufficient quantity of qualified labor, plaintiff, of course, is not entitled to recover if defendant in fact furnished sufficient qualified labor. Plaintiff says that it did not, and relies in support of this assertion on the extension of 120 days granted by the contracting officer to cover delays “due to insufficient supply of qualified labor available through the source of procurement stipulated in said contract.” This extension order, signed by H. E. Pitz, Lt. Col. Q. M. C., Acting Chief, Construction Division, and dated July 24, 1936, reads as follows:
With reference to your letter of July 11,1936, requesting an extension of time for performance of your contract * * * due to insufficient supply of qualified labor available through the source of procurement stipulated in said contract, you are advised that an investigation by this office has disclosed that work on the project ás a whole was delayed one hundred and twenty days as a result thereof.
Under the provisions of Article 9 the completion time of Contract No. W 6119 qm-54 is hereby extended one hundred and twenty days beyond the completion date stipulated therein.
Colonel Pitz, however, testified that he had no knowledge of the facts, but relied upon the statements and recommendations of his subordinates and that “normally the recommendation of the constructing quartermaster is the controlling factor in the case.”
On July 15,1936, the constructing quartermaster wrote the Quartermaster General in Washington enclosing nine letters *386 from plaintiff requesting extension of time on account of delays due to a shortage of labor. He called attention to plaintiff’s letter of July 11,1936, requesting an extension of 120 days on this account. With reference to these requests the constructing quartermaster says:
Kealizing that the contractor was delayed on this account, this office recommends that an extension of 120 days be granted and the enclosed extension order be approved.
In reply the office of the Quartermaster General wrote the constructing quartermaster calling attention to the labor provision of the contract set out above, and stating:
In the event that qualified workers other than members of organized labor were not available during the period of the need for such workers, the request of the contractor should be supported by a certificate from the Employment Agency designated by the United States Employment Service to the effect that qualified nonunion labor was not available.
Two days after the date of this letter, M. C. Wright, plaintiff’s superintendent, approached H. S. Kent, District Manager of the United States Employment Service at Anniston, Alabama, and presented to him a letter which had been drafted by Wright and asked Kent to copy the letter on the stationery of the United States Employment Service and sign it and swear to it. Kent agreed. The letter was copied on the stationery of the Employment Service, and was not only signed by Kent, but was sworn to by him before a Notary Public. The original and a copy of the letter were delivered to M. C. Wright. The copy was also sworn to. Wright took the original and delivered it to the constructing quartermaster. It read as follows:
I hereby certify that qualified skilled labor was-not available in sufficient numbers to fill the requisitions presented by Worsham Brothers, contractor for the construction of one Barracks Building at Fort McClellan, Alabama.
Although this office made every endeavor to furnish qualified workers to this contractor, unnecessary delays were caused in furnishing many qualified workers *387 because they were not available at the time requisitions were received from the contractor.
In many instances, qualified workers requested did not report to the contractor within a reasonable length of time. The time that elapsed from receipt of requisitions until men reported was excessive.
Yours very truly,
H. S. Keot

District Manager

Upon receipt of this letter the constructing quartermaster prepared the extension order set out above, and forwarded it to the Quartermaster General in Washington. It was signed and returned to the constructing quartermaster, who delivered it to plaintiff on August 9,1936.
A careful review of all the evidence convinces us that Kent’s affidavit was a piece of manufactured evidence, that it was misleading, and did not state the true facts.
Plaintiff from his home office in Knoxville, Tennessee, was constantly writing his superintendent, urging him to ask for extensions of time on one pretext or another. The first such letter was written on January 9, 1936, before the job had hardly got under way. It read in part:
Do not fail to begin to ask for extension of time on everything you have an excuse for and do not wait until later on in the job. Get on the good side of Ebeling so he will grant us all the extensions we may need.
As another sample of such letters, we quote the following written on March 18,1936:
One thing we must do is to get requisitions in, in writing, and to keep asking for extension of time. Set out in your letters that our overhead is tremendous due to their not furnishing sufficient numbers of workmen and write them a letter every few days. DO NOT FAIL TO DO THIS, [sic] We have gone on record from this office stating that we are going to enter a claim for this overhead but, confidentially, we do not believe the Government will allow us anything for any claim we may set up for this. However, if you keep your files built up properly, then we have a better chance. It will also help in getting the extension of time.
*388 After Wright had secured from Kent the above affidavit he wrote plaintiff as follows:
After talking with Spear and explaining the situation to him, he agreed to leave it up to Kent. After chewing the rag awhile I finally got Kent to agree to it and I took him to town and a Notary Public and got it fixed up. I am enclosing a copy of the affidavit.
It occurs to me that these affidavits or affidavit affords us valuable evidence should you elect to claim for damages against the Government. That is why I made the copy before turning the original over to the Major (the Constructing Quartermaster). Our.claim for damages or additional cost caused by the labor situation can well be substantiated by the affidavit, which clearly states that we are unable to procure men as and when needed.'
Kent was introduced as a witness for the plaintiff. He was loath to admit that he had copied the letter written by Wright, but upon cross examination did so, inferentially .at least. He reiterated on the stand the statements made in the affidavit, but he confessed that the requisitions for laborers' and the records of when these requisitions were filled did not support his affidavit, — why, he could not explain. He further admitted that some men he had sent to the job were not given employment because of the weather or because materials had not arrived or “something like that.”
Major Jabelonsky, the constructing quartermaster, stated on the stand that he had recommended the granting of an extension of time of 120 days on account of an insufficient supply of labor, but he admitted that in doing so he had taken into consideration a number of other things which had caused delay, such as weather conditions, incorrect work which had to be changed, faulty installation of reenforcing steel, defective stone, delay in delivery of stone, and “an awful lot of delays” due to tardy delivery of other materials, and “considerable delay” due to “door bucks.” All of these things he said he took into consideration in recommending the extension of 120 days. He said the reason the extension was based alone on the labor difficulties was because the Government was not responsible for the other delays, and that he wanted to give “the contractor a break.”
Defendant offered the testimony of a number of witnesses which led strongly to the conclusion that there had not been *389 an insufficient supply of qualified labor. However, the commissioner of this court felt bound by the facts stated in the order granting the extension of time and reported to the court that there had been a delay of 120 days due to an insufficient supply of qualified labor.
After the case was argued before the court, it was remanded to the commissioner for the taking of further testimony on this question. Further testimony was taken. The defendant introduced witness after witness, all of whom testified that, instead of there being an insufficient supply of qualified labor, there was an abundant supply. They testified that men came to the job day after day seeking work, sent there by the United States Employment Service, but were turned away and told to come back later. Fourteen or more such witnesses were introduced, after which the acting commissioner stopped the introduction of further testimony. One witness was the business manager of the carpenters’ union; another was the financial secretary of the carpenters’ union; another was the business agent for the carpenters’ local; another was the business agent of the bricklayers’ union; others were carpenters and bricklayers who had been sent to the job by the Employment Service and had been turned away; others were carpenters and bricklayers who had worked on the job and who were familiar with the labor situation. Typical of their testimony is that of the witness C. J. Martin. He says:
* * * I was going out there day after day and morning after morning, I will say, rather, burning up everything I could get in gas and oil, to see if I could get on to work, just standing around out there, trying to get on for work, and it was not only me, but others were out there in the same shape.
Q. And what would they say to you on these occasions ?
A. Sometimes they would say “We haven’t got the material,” or “we haven’t got room for you,” or “wait a while and we will put some more men to work in a little while,” and different things like that. *****
Q. And you said that you exhausted your money and gasoline?
A. Yes, sir, I exhausted everything, we didn’t have much work here then and hadn’t had for sometime, and everything was pretty trying for the carpenters then.
*390 Major Jabelonsky was recalled for further examination. He was asked:
Q. Now, it appears from the language of this extension order, Col. Jabelonsky, that the extension of time of 120 days was based upon the Government’s failure to furnish an adequate supply of labor. I want to ask you this question as a matter of fact, if you know first-hand that Worsham Brothers was or was not delayed any because of an inadequate supply of labor ?
He answered:
A. They were not.
After ruling on the objection of plaintiff’s attorney, the commissioner ordered the question repeated to the witness. His reply was:
They were not delayed by labor whatever. There was more than an ample supply of labor at all times.
He was then asked:
State the facts concerning your recommendation to Col. Pitz regarding this extension of time.
He answered:
The contractor, at the contractual end of the contract, was very much behind. He had considerable difficulty with the weather, materials, etc. There was a penalty calling for liquidated damages which we wanted to save the contractor from paying. There was mismanagement on the job unbeknownst to Mr. Worsham. He had considerable difficulty the first part of the year on account of delay upon delay. I felt sorry for the contractor, and we wanted to help him along. The only way to help him along was to give him an extension of time. We could not give an extension of time on account of the weather. The peculiarities of Government contracts are that a contractor is supposed to know about the weather in advance. He had considerable difficulty from materials, etc. Now, the contract, out of the Government regulation, doesn’t permit an extension of time on account of weather conditions, and the only thing we could say was the labor. As a matter of fact, it wasn’t labor at all. I am making a clean breast of it, which I did before a couple of times. It was due entirely to save the contractor from paying liquidated damages and help him along so to speak, to give the poor contractor a break all the way through.
*391 He further testified:
Q. I will ask you whether or not this is a fact, that at the completion date, as fixed by the terms of the contract, the Government was not really in need of the building at that time or later and it would not make any material difference whether or not the contract was finished exactly on that day ?
A. No, sir. We had no need for the building for probably two or three months thereafter. We didn’t need the building at that particular contractual date. In matter of fact, troops didn’t move there until considerably after the contract was complete all the way through. Now, that was one of the reasons we wanted to give the contractor a break. We had no particular need for the building at the time. There were no troops, nobody to occupy the building.
Q. Did you take that into consideration or not when you made this indulgence-
A. Of course I did.
Q. (Continuing). Concerning Worsham?
A. Of course I did.
Q. I will ask you, Col. Jabelonsky, if complaints came to your office there concerning the way and manner in which Worsham Brothers’ superintendent was handling his labor ?
A. Yes, sir; very frequently, more or less two or three a week.
Q. I will ask you what was the nature of those complaints, who made them, and who was present at the time?
A. I always made a point to have the contractor’s superintendent, the contractor’s foreman, at my office in order to see if I could settle this matter with the labor. Most of the troubles with the labor was that they had been sent out there, many, many times been sent out by the employment agency to go to work.
He repeated the foregoing testimony on cross-examination. He was asked:
Q. And you mean to tell the court, and you want the court to understand that in this case you recommended that an extension of time be granted on account of labor conditions when you knew that there wasn’t any delay on that account ?
A. I did. Yes sir; in order to give the contractor a break. I will say that again.
*392 We are convinced that the defendant not only furnished plaintiff sufficient qualified labor, but that it furnished him more than he could use and, therefore, that plaintiff is not entitled to recover damages for this 120 days of delay.
The nest item is for increased cost to plaintiff for the salt-glazed tile base. Under the contract all walls and' partitions, with certain exceptions, were to be constructed of building tile or to be plastered in lieu of the construction specified. The construction specified was salt-glazed tile to the full height of the walls and partitions and, if the salt-glazed tile was not used, then a deduction was to be made for plastering. Plaintiff elected to plaster the walls and partitions and a deduction was made. The constructing quartermaster required plaintiff to install salt-glazed tile at the bases and then plaster to the ceiling. Plaintiff contends that the provision did not require that the bases of the walls and partitions be of salt-glazed tile. On the plans the letters “S. G. T. B.” were plainly marked which showed to the contractor that salt-glazed tile base was required. From the terms of the contract and plans it is quite clear that the construction placed on the contract by the constructing quartermaster is correct. There can be no recovery on this item.
We are of opinion plaintiff is not entitled to recover. His petition, therefore, will be dismissed. It is so ordered.
LittletoN, Judge, concurs.